UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re<br><br>**BOFFI STUDIO DC, LLC,**<br><br>Debtor. | Chapter 11<br><br>Case No. 09-01023 |

**BOFFI SpA AND BOFFI U.S.A., INC.'S REPLY TO THE OPPOSITION
OF BOFFI STUDIO DC, LLC TO THE MOTION OF BOFFI SpA
AND BOFFI U.S.A., INC. PURSUANT TO SECTION 365 OF THE
BANKRUPTCY CODE FOR ENTRY OF AN ORDER COMPELLING THE
<u>DEBTOR TO REJECT THE COMMERCIAL AGREEMENT</u>**

Boffi SpA and Boffi U.S.A., Inc. ("<u>Boffi</u>"), by and through its counsel, Kelley Drye & Warren LLP, hereby files its Reply (the "<u>Reply</u>") to the Opposition of Boffi Studio DC, LLC (the "<u>Opposition</u>") to the Motion of Boffi SpA and Boffi U.S.A., Inc. Pursuant to Section 365 of the Bankruptcy Code for Entry of an Order Compelling the Debtor to Reject the Commercial Agreement (the "<u>Motion</u>").[1]  In support of the Reply, Boffi respectfully states as follows:

**I.     <u>The Debtor Is Unable to Cure, Much Less Assume the Commercial Agreement</u>**

   **A.     <u>Insurmountable Cure Amounts</u>**

   1.     The Debtor represents that it needs additional time to determine whether to assume or reject the Commercial Agreement.  The Opposition, however, is completely silent as to how assumption and cure is even an option given the stark realities of its bankruptcy case. Simply put, the Debtor's bankruptcy case after almost two months is adrift and headed nowhere.

---

[1]    In the alternative, Boffi also requests the relief sought in the Motion of Boffi SpA and Boffi U.S.A., Inc. Pursuant to Section 362 of the Bankruptcy Code for Entry of an Order Granting Relief From the Automatic Stay to Terminate the Commercial Agreement (the "<u>Motion to Lift the Automatic Stay</u>"), filed contemporaneously with the Motion on December 21, 2009.

The Debtor lacks the ability to reorganize, a fact that no amount of additional time will rectify for the reasons set forth below.

        2.      A brief overview of the facts of this case are illustrative.  The Debtor must pay Boffi over $100,000 and also must cure the financial benchmarks detailed in Article 8 of the Commercial Agreement.[2]  The Debtor's landlord is owed over $200,000 in back rent for the Boffi Showroom located at 3320 M – NW Street, Washington DC 20007 (which continues to accrue at $25,000 per month) (the "<u>Premises</u>").  The Debtor, however, has no means by which to cure these existing defaults.  The Debtor has not obtained any postpetition financing, and has no apparent plans to do so.  The Debtor is not conducting any postpetition business.  In fact, the Debtor's business is in full liquidation mode and is selling off its floor displays, the same floor displays it would need to conduct business as a reorganized entity.  The Debtor is not generating any income or cash from the liquidation that is not encumbered by the $1.525 million EagleBank note and the Cash Collateral Stipulation.  In the absence of any business or financing, it is quite clear that the Debtor does not intend or even have the means to cure, much less provide adequate assurance of future performance.  The Debtor therefore should be required to reject the Commercial Agreement immediately.

    **B.**    <u>**The Cash Collateral Stipulation Appears to be Designed Solely for the Benefit of an Insider**</u>

        3.      The Debtor's argument that the Cash Collateral Stipulation prevents rejection of the Commercial Agreement is without merit.  First, the Debtor fails to explain how rejecting the Commercial Agreement now will impede the Debtor's liquidation under the Cash Collateral Stipulation, particularly where Boffi represented to the Debtor that they could use the Boffi name during the wind-down.

---

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

4. Second, the Cash Collateral Stipulation itself appears to be nothing more than a vehicle put into place solely for the indirect benefit of an insider rather than a means to truly help the Debtor reorganize. The primary obligor on the EagleBank note is ZeinCo, an entity completely owned -- upon information and belief -- by Claude Zein. The Debtor, which is also 100% owned by Mr. Zein, is a guarantor on the EagleBank note. The Cash Collateral Stipulation provides that any funds generated in a three-month liquidation of the floor displays over business expenses flow to EagleBank. In the absence of postpetition financing, the Cash Collateral Stipulation simply allows the Debtor to reduce the liability of ZeinCo, with little or no residual use of generated cash for the benefit of the Debtor's estate. In short, the Cash Collateral Stipulation leaves the Debtor without the ability to reorganize or to cure.

C. **The Commercial Agreement and Use of the Boffi Name is Only for the Premises**

5. The Debtor also contends that its imminent relocation to another building in the same geographic area is not an incurable default that prevents assumption of the Commercial Agreement. This is simply not true. The Premises and the Commercial Agreement go hand in hand, with the Premises identified no less than eight times in the agreement. For instance, Article 1 of the Commercial Agreement states that the Premises "constitute an integral and substantial part of the Agreement." Article 4.2 states that only the Premises shall be used to sell Boffi Products, with the failure to do so an event of termination under Article 10.3. Article 6 states that Boffi is obligated to let the Debtor use the Boffi name only at the Premises. Boffi conducts a great deal of due diligence in selecting its exclusive studios, with architectural design, lay out, and exposure to pedestrian and vehicular traffic all of paramount importance. Boffi expended the same degree of selectivity in choosing the Premises in the Commercial Agreement.

The Debtor cannot now be permitted to re-write the Commercial Agreement to remove the Premises as a material component of Boffi's benefit of the bargain.

      D.      **<u>The Financial Benchmarks Are a Material Component of the Commercial Agreement</u>**

      6.      The Debtor's attempt to use Boffi's willingness to work with the Debtor as a waiver of the financial benchmarks should be rejected outright. As an initial matter, the Debtor confuses its gross income as stated in the Debtor's Statement of Financial Affairs with the financial benchmarks detailed in Article 8 of the Commercial Agreement. The financial benchmarks reflect a minimum amount of Boffi Products ordered by the Debtor; the Debtor's gross income from the sale of such products is irrelevant.

      7.      Second, it is highly disingenuous to contend that Boffi, by amending – as opposed to terminating – the Commercial Agreement on two occasions at the Debtor's request, somehow waived the financial benchmarks in Article 8. Nothing in the First Amendment (entered into on November 7, 2008) or the Second Amendment (entered into on May 5, 2009) modifies and/or waives the sales requirement in Article 8. In fact, each of the amendments state that they only modify the payment terms of the Commercial Agreement. Nor should Boffi's patience in working with the Debtor (as opposed to terminating the Commercial Agreement) be construed as a waiver of the Commercial Agreement's material provisions. This is quite unlike the circumstances reflected in *In re S & I Investments*, 2009 WL 3233039 (Bankr. S.D. Fla. Oct. 7, 2009), the case cited by the Debtor in support of waiver. In *S & I*, the court held that a landlord waived a rent escalator provision by failing to enforce such a provision for *four decades*.

      8.      Equally dubious is the contention that the financial benchmarks should not be a material term to the Commercial Agreement due to the economic downturn, and because

4

Mr. Zein invested money into the Debtor. First, Mr. Zein, who owns 100% of the Debtor and numerous other businesses, is a sophisticated businessman with years of experience and knows full well that starting a business requires capital and entails risk. But such capital and risk does not entitle Mr. Zein to re-write the Commercial Agreement. Second, the Commercial Agreement was twice amended at Mr. Zein's behest during the downturn and in each instance the financial benchmarks remained the same. Mr. Zein, as the Debtor's principal, clearly believed that such financial benchmarks were appropriate and reasonable. The minimum sale targets are a material component of the Commercial Agreement and Boffi's bargained for exchange. *See In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1092 (3d Cir. 1990) (holding that a minimum sales figure provision was material "in the sense it goes to the very essence of the contract, i.e., the bargained for exchange."). Thus, the financial benchmarks should be enforced.

      E.      **The Plain Meaning of Section 365(c) Prevents Assumption of the Commercial Agreement**

      9.      The Debtor ignores the plain meaning of section 365(c) of the Bankruptcy Code, which prevents assumption of an executory contract where applicable non-bankruptcy law prevents assignment of such agreement. As discussed in the Motion, the Commercial Agreement involves the use of the Boffi name at the Premises, and the Lanham Act and federal trademark law prohibit the assignment of non-exclusive trademark licenses. *In re Travelot*, 286 B.R. 447, 454 (Bankr. S.D. Ga. 2002); *Wellington Vision, Inc. v. Pearle Vision*, 364 B.R. 129, 134 (S.D. Fla. 2007); *In re N.C.P. Mktg.*, 337 B.R. 230, 234-36 (D. Nev. 2005).

      10.      In interpreting section 365(c), the Supreme Court has held that statutory interpretation starts with the statutory language. *See Connecticut Nat'l Bank. v. Germain*, 503 U.S. 249, 253-54 (1992) (statutory language is the "cardinal canon" to be addressed "before all others"). And "when a statute's language is plain, the sole function of the courts, at least where

5

the disposition by the text is not absurd, is to enforce it according to its terms." *In re American Home Mortgage, Inc.*, 379 B.R. 503, 514 (D. Del. 2008) (*quoting Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 7 (2000)). The Supreme Court has also "repeatedly stated '[t]he United States Congress says in a statute what it means and means in a statute what it says there.'" *Id.* (*quoting Hartford Underwriters Ins.*, 530 U.S. at 6); *see Connecticut Nat'l Bank.*, 503 U.S. at 253 ("When the words of a statute are unambiguous, then, this first canon [statutory language] is also the last: the judicial inquiry is complete.").

11. In addition, the Debtor's policy argument against the plain meaning of section 365(c) does not warrant a re-write of the statute. *See In re Catapult Entm't*, 165 F.3d 747, 755 (9th Cir. 1999) (holding "that policy arguments cannot displace the plain language of [section 365(c)]"). Yet, a re-write is exactly what the Debtor proposes with the "actual test" by grafting a "narrow exception onto section 365(c) for debtors in possession, providing that, as to them, the statute only prohibits assumption *and* assignment, as opposed to assumption *or* assignment." *Id.* As discussed above, the Supreme Court has repeatedly instructed that the best way to determine congressional intent is to apply the plain meaning of the text of the statute, a fact not lost on the Third, Fourth, Ninth and Eleventh Circuits in adhering to the plain meaning of 365(c) to prevent assumption.[3]

---

[3] *In re Sunterra Corp.*, 361 F.3d 257, 267 (4th Cir. 2004) (holding that debtor software licensee was statutorily barred from assuming license agreement in the absence of the licensor's consent pursuant to the "plain language" of section 365(c)(1)); *Cinicola v. Scharffenberger*, 248 F.3d 110, 121 (3d. Cir. 2001) ("[I]f a contract could not be assigned under applicable nonbankruptcy law, it may not be assumed or assigned within the meaning of 11 U.S.C. § 365(c)(1)); *Perlman v. Catapult Entm't, Inc. (In re Catapult Entm't, Inc.)*, 165 F.3d 747, 754-55 (9th Cir. 1999) (following the plain language test and holding that section 365(c) of the Bankruptcy prevents assumption of non-exclusive patent license); *In re James Cable Partners*, 27 F.3d 534, 537 (11th. Cir. 1994) (following the plain language test and holding that the debtor "may not assume" an executory contract if "applicable law" excuses the non-debtor party from accepting performance from an entity other than the debtor or debtor in possession, and the non-debtor party to the contract has not consented to the assumption of the contract).

12. Where the plain meaning of the statute is clear, and its language does not produce a patently absurd result, this Court should follow the holding of four circuit and other lower courts and hold that the Debtor cannot assume <u>or</u> assign the Commercial Agreement pursuant to section 365(c) of the Bankruptcy Code.

### F. <u>Conclusion</u>

13. In sum, the Debtor's Opposition fails to rebut any of the reasons set forth in the Motion calling for the immediate rejection of the Commercial Agreement. After two months, the Debtor's chapter 11 bankruptcy case has ground to a halt and the Debtor is without any means to cure the Commercial Agreement. Nor can the Debtor assume the Commercial Agreement pursuant to the plain meaning of section 365(c). Accordingly, the Debtor should be ordered to immediately reject the Commercial Agreement.

Dated: New York, New York
      January 11, 2010

**KELLEY DRYE & WARREN LLP**

By: */s/ David J. Ervin*
    David J. Ervin (VSB No. 34719)
    Washington Harbour Suite 400
    3050 K Street, NW
    Washington, D.C. 20007
    (212) 342-8400

    and

    James S. Carr (JC 1603)
    Jason Alderson (4572665)
    101 Park Avenue
    New York, NY 10178
    (212) 808-7800

    Attorneys for Boffi SpA and
    Boffi U.S.A., Inc.